UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

Case No.:

KENNETH HAMNER,

           Plaintiff,

vs.

RONALD WENTZ, individually,
WILLIAM MORASH, individually,
ANDREW MCINTOSH, individually,
JOSEPH BRENNAN, individually,
RUSSELL CULLUM, individually, and
KENNETH J. MASCARA, as SHERIFF of
ST. LUCIE COUNTY, Florida,

           Defendants.

_____/

## COMPLAINT
## INTRODUCTORY STATEMENT

1.      This is a civil action seeking money damages in excess of $30,000 dollars, exclusive of costs, interest, and attorney's fees, against Defendants, RONALD WENTZ, individually, WILLIAM MORASH, individually, ANDREW MCINTOSH, individually, JOSEPH BRENNAN, individually, RUSSELL CULLUM, individually, and KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

2.      This action is brought pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.  The United States District Court for the Southern District of Florida has jurisdiction of this action under 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343.   Plaintiff further invokes the supplemental jurisdiction of the United States District Court to hear pendant State tort claims arising under State law, pursuant to 28 U.S.C. §1367(a).

3.     Plaintiff has fully complied with all conditions precedent to bringing this action imposed by the laws of the State of Florida, and particularly by the provisions of § 768.28 of the Florida Statutes.

**PARTIES**

4.     Plaintiff KENNETH HAMNER (hereinafter "Plaintiff" or "Kenneth Hamner") is a resident of Fort Pierce, St. Lucie County, state of Florida.

5.     At all times referred to herein, Defendant RONALD WENTZ [hereinafter Defendant WENTZ] was acting under color of law as a detective for Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, and in such capacity as an agent, servant, and employee of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

6.     At all times referred to herein, Defendant WILLIAM R. MORASH [hereinafter Defendant MORASH] was acting under color of law as a detective for Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, and in such capacity as an agent, servant, and employee of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

7.     At all times referred to herein, Defendant ANDREW MCINTOSH [hereinafter Defendant MCINTOSH] was acting under color of law as a supervisory employee with the rank of lieutenant for Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, and in such capacity as an agent, servant, and employee of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

8.     At all times referred to herein, Defendant JOSEPH BRENNAN [hereinafter Defendant BRENNAN] was acting under color of law as a detective for Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, and in such capacity as an agent,

servant, and employee of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

9. At all times referred to herein, Defendant RUSSELL CULLUM [hereinafter Defendant CULLUM] was acting under color of law as a deputy for Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, and in such capacity as an agent, servant, and employee of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

10. Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida [hereinafter Defendant KENNETH J. MASCARA or Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE], is the SHERIFF of ST. LUCIE COUNTY, Florida, as organized and existing under the Constitution and laws of the State of Florida. In this cause, Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE acted through its agents, employees, and servants, including Defendant WENTZ, Defendant MORASH, Defendant BRENNAN, Defendant MCINTOSH, Defendant CULLUM, and others.

11. Plaintiff sues Defendant WENTZ, Defendant MORASH, Defendant MCINTOSH, Defendant BRENNAN, and Defendant CULLUM in their individual capacities.

## FACTS COMMON TO ALL COUNTS

12. At all times material hereto, Sheila Hamner lived with her son Kenneth Hamner at 379 Traub Avenue, Fort Piece, St. Lucie County, State of Florida.

13. Sheila Hamner had five adult children. All live in Fort Pierce, and the family is well known in the community.

14. At all times material hereto Sheila Hamner's eldest son Richard ("Rick") Hamner was a Fire Protection Specialist for the state of Florida, Division of State Fire Marshall, and previously

worked as a corrections officer for St. Lucie County.

15.     At all times material hereto Sheila Hamner's son Kevin Hamner was engaged to a civilian employee of the St. Lucie County Sheriff's Office.

16.     At all times material hereto Sheila Hamner's oldest daughter Marcia Mele was married to David Mele, who was a lieutenant with the St. Lucie County Fire District.  Their son Hank was also a firefighter for the St. Lucie County Fire District.

17.     At all times material hereto Sheila Hamner's youngest daughter Lisa Hamner DiFrancesco worked as a dispatcher for the St. Lucie County Fire District.

18.     At all times material hereto, Plaintiff worked for McKesson Corporation training employees responsible for the scheduling of medical appointments on behalf of institutional health care providers.  Plaintiff was also well known in the local community as the singer of the local classic rock/country-rock bands Wild Card, and State Road 70.

19.     The residence at 379 Traub Avenue in Fort Piece was originally built by Plaintiff's grandfather in the 1950's on 1.1 acres of land on an unpaved gravel road.  The house was is located on the south side of Traub Avenue towards a dead end, and surrounded by a high chain linked fence. There is a circular driveway with chain linked fence gates.   The property included a detached two car garage, storage shed, and gazebo.

20.     South of the residence (through the back yard) was a heavily wooded area and a large drainage ditch.  The residence was approximately 1000 feet north of Midway Road.  The structures on Midway Road were substantially commercial or industrial.  Some were old and in ill repair, or abandoned, including a structure once used as a pool supply store. Other structures included the St. Lucie County Fire District Station 6 (located approximately 1000 feet southeast of 379 Traub), a Walgreens Store (located approximately 1000 feet southeast of 379 Traub), a Wendy's Restaurant

(located approximately 800 feet west southwest of 379 Traub on U.S. Highway 1), and a Dunkin Donuts (located approximately 800 feet west northwest of 379 Traub on U.S. Highway 1)

21.     Traub Avenue was frequently used as a short cut by persons living north of Traub who were walking (or riding bikes) to the businesses located on Midway and U.S. Highway 1 via an empty lot on the west side of the Hamner's property.

22.     On the evening of December 9, 2016, Plaintiff performed with the band State Road 70 at the Midtown Grill and Bar, located at the Days Inn by Wyndam in Midtown Fort Pierce.

23.     Following the show Hamner stayed up into the early morning hours talking with his mother, Sheila Hamner.

24.     The following morning Sheila Hamner traveled to WalMart and purchased a T-shirt for Plaintiff to wear during his performance scheduled for that evening, Saturday, December 10, 2016.  She also purchased a lottery ticket at Publix Supermarket at 1:59 pm, and returned home at approximately 2:10 pm.

25.     When Sheila Hamner returned home she awoke Plaintiff (who was sleeping on the couch in the family room) and showed him the T-shirt.  Plaintiff liked the shirt, told his mother it was beautiful, and fell back asleep on the couch.  Plaintiff's alarm clock was set for 3:30 pm.

26.     Plaintiff awoke at 3:22 pm (before his alarm clock rang).  He began making coffee, and used the bathroom.  Plaintiff then called out to his mother (to see if she was in the bathroom in her bedroom), and receiving no reply, entered the bedroom to use her computer.

27.     Hamner logged into Facebook and began thanking acquaintances who came out the prior evening to see Plaintiff perform with State Road 70 at the Midtown Grill and Bar.

28.     When Sheila Hamner did not return after several minutes Plaintiff became concerned and went to check on her in the garage, where the clothes washer and dryer were located.

29.     The washer and dryer were positioned along the south wall of the garage adjacent to the doorway located in the southeast corner of the garage.   The garage itself was partitioned by a wall running north-south, with a doorway that provided access from the area where the washer and dryer were located to the west side of the garage.  The doorway was just a few steps north of the location of the washer and dryer.

30.     The west side of the partitioned garage was converted into an apartment, but used mostly for storage by the Hamner children and their families.  The apartment itself included a closet, toilet, and shower, as well as a separate entrance door on the south wall of the garage that allowed for entry-exit into the backyard of the Hamner residence towards the direction of a storage shed.

31.     Carlos Gilbert Arellano-Ramirez (hereinafter "Arellano") was raised in the area near Traub Avenue.  Arellano was well known to local law enforcement.  In August 2015, Arellano was arrested on charges filed by Defendant MORASH for the felony offense of child abuse (for committing battery on a minor child), St. Lucie County Case No.: 56-2-015-CF00228A.  At the time Defendant MORASH submitted the warrant affidavit for Arellano's arrest, Defendant MORASH described the then 22-year-old Arellano as a Hispanic male, with black hair, 5'5" and 125 lbs. Arellano's address was listed as his mother's residence located at 345 Weatherbee Road East, Fort Piece, Florida.  That address is approximately 300 yards north of 379 Traub.

32.     On December 7, 2016, Arellano burglarized the residence of Dana Lorena Gates (whom he knew from a anger management program as part of his sentence in Case No.: 56-2-015-CF00228A).  At the time, Gates lived at 4988 Whispering Pines Lane, Fort Pierce, Florida, and had briefly befriended Arellano.

33.     During the burglary Gates confronted Arellano inside her residence. Arellano's pockets were filled with Gates' personal property.  Arellano fled on foot.  The location of 4988

Whispering Pines Lane is approximately ½ mile northwest of Arellano's residence at 345 Weatherbee Road East, Fort Piece. (Gates contacted law enforcement, but when efforts were made to apprehend Arellano he fled on foot out the back of his mother's residence. Arellano threatened retaliation against Gates for contacting the police, resulting in Gates seeking an order of protection).

34.     On December 10, 2016, Carlos Gilbert Arellano-Ramirez entered the apartment area of the garage at 379 Traub. He left fingerprints on several items inside the garage and defecated on the floor of the shower.

35.     When Sheila Hamner approached or entered the garage (by door near the washer and dryer), she was attacked and murder by Arellano with a knife.

36.     Post-mortem, the DNA of Arellano was located under the fingernails of Sheila Hamner's right hand. Sheila Hamner was 74 years old at the time of her death, and died from blood loss.

37.     At approximately 3:41 pm Plaintiff went to the garage to check on his mother and observed her feet inside the east side entrance door of the garage.

38.     When Plaintiff approached the entrance door to the garage he observed the body of his deceased mother, Sheila Hamner.

39.     Sheila Hamner was laying on her back. Her feet were close to the door adjacent to the washer and drying. The door to the clothes dryer was open, and there was dried clothing inside the dryer.

40.     As Plaintiff rushed to his mother's side his initial thought was that she suffered a heart attack (due to prior medical issues). At that point, Plaintiff had tunnel vision and barely noticed any blood on the left side of Sheila Hamner's body.

41.     As Plaintiff kneeled next to his deceased mother's body he felt a sensation in the area

of his back or head.  Plaintiff described the sensation as more of a feeling, like possibly the wind or an object being thrown at him.

42.     The sensation Plaintiff experienced caused him to look up just as Arellano attempted to murder Plaintiff (with a knife).

43.     Plaintiff instinctively raised his forearms and was struck in the area of the right forearm, just below the elbow.  (See photograph of Kenneth Hamner's right forearm, attached hereto as Exhibit A)

44.     The garage was extremely dark due to the time of day and year.   When Plaintiff looked up he observed a person in the darkness a few feet away from the door that separated the east and west sides of the garage.

45.     In the split second that Plaintiff had to decide whether to run or fight, he observed what he thought was a knife and a killer who's eyes Kenneth Hamner described as unemotional and cold.

46.     Plaintiff turned and fled in the direction of Traub screaming that his mother had been killed.

47.     As Plaintiff ran (barefooted) out into Traub Avenue he left behind a blood trail from the deep and actively bleeding laceration to his right forearm.

48.     Plaintiff first encountered Karen Wilson (hereinafter "Wilson"), his neighbor who lived across the street.  Wilson called 911.  A second neighbor also called 911, while others stopped what they were doing and walked or ran towards 379 Traub, including (in chronological order) William West, Shawn Adams, Joel Johnson, and Kimberly Taylor.

49.     Plaintiff took a pipe that was used to prop up the family mailbox and ran back towards the garage. At that time, Plaintiff believed the killer was still inside the garage, when in fact,

as Plaintiff exited the garage and ran north towards Truab Avenue, Arellano ran south through the backyard of the residence into the wooded area, whereupon Arellano crossed a drainage ditch and continued south towards Midway Avenue.

50. The area behind (south) the Hamner residence is not visible from Traub Avenue due to the physical location of the main house and garage. Although there is an open air breezeway between the house and garage, crime scene investigator Bridget M. Coghlan observed that the breezeway itself is not clearly visible from Traub Avenue due to trees, shrubbery, and a panel of lattice work blocking the view. (See photograph of front of main house, garage, attached hereto as Exhibit B, and photograph of connecting breezeway, attached hereto as Exhibit C).

51. A surveillance video from an nearby residence (which does not show the area of the Hamner's garage) shows Plaintiff running towards the direction of Traub at 3:39:36 pm.

52. Thirty-two seconds later at 3:40:08 pm, William West begins to walk from his driveway towards Truab and then continues walking west on Traub towards the Hamner residence.

53. At 3:40:16 pm, Plaintiff is seen running south back towards the residence, in the direction of the garage.

54. At 3:40:28 pm, Shawn Adams (hereinafter "Adams") is seen exiting the driveway at 369 Traub and running towards 379 Traub.

55. Joel Johnson (hereinafter "Johnson") and his girlfriend Kimberly Taylor (hereinafter "Taylor") lived at 369 Traub, Apt. # B. At 3:40:45, Johnson is seen exiting the driveway at 369 Traub (approximately 200 feet from the Hamner residence) and running towards 379 Traub. Johnson was followed by Taylor, who exited 369 Traub and began walking towards Traub at 3:41:04 pm.

56. Upon returning to the garage Plaintiff attempted to pull his mother to safety with one

hand, while holding the pipe in the other hand.  However, the body of Sheila Hamner was too heavy.

57.     By that time West, Adams, Johnson, and Taylor arrived at the location of the garage.

58.     Johnson observed Plaintiff standing over his mother holding the pipe.  Johnson stated there was "a shit load of blood" dripping off the pipe.

59.     Johnson screamed at Plaintiff several times to "put the fucking pipe down."  Johnson described Plaintiff's demeanor as "like a rage."  Johnson explained that Plaintiff either put the pipe down or Johnson took the pipe from Plaintiff.

60.     Johnson entered the garage and picked up Sheila Hamner's leg, and touched her foot. There were no signs of life and Johnson believed that Sheila Hamner was deceased.

61.     Plaintiff collapsed on the ground outside the garage and was in a state of shock.

62.     Due to the very poor lighting inside the garage (and the fact he was in shock), Plaintiff initially described the assailant (whom he had seen for only a slit-second, after being attacked and stabbed) as a black male.

63.     While on the ground outside the garage Plaintiff was substantially incoherent, screaming, and bleeding.  The fourth of four (4) neighbors who approached the area of the garage was Taylor.  Taylor was a mother of several children and worked at Burger King. When Taylor's boyfriend (Johnson) circled the garage and did not see a black male (or anyone else),  Taylor looked at Plaintiff (in front of Johnson and others) and stated loudly: "I think he did it."  Suspecting that Plaintiff was the killer, all the neighbors left the area of the garage and retreated back onto Traub Avenue.

64.     Fire rescue and law enforcement arrived within two (2) minutes.

65.     Deputy Tanya Wright arrived just after Fire-Rescue and was the first deputy on scene. When Wright arrived Plaintiff was seated on the ground in the breezeway between the garage and

the house.

66.     According to Joel Johnson (who lived at 369 Traub and was one of the first persons to respond to Plaintiff's screams and calls for help), the next deputy to arrive was Sheriff Ken Mascara.  A substantial number of deputies arrived thereafter and assisted in the investigation.

67.     Firefighter-Paramedic Jose Rosario ("Rosario") was at Station 6 located on Midway Avenue (almost directly behind the Hamner's backyard) when the alarm sounded.  The call was for 379 Traub. St. Lucie County Fire District Lieutenant David Mele (hereinafter "Mele") immediately recognized the address as the residence of his mother-in-law, Sheila Hamner.

68.     Because the call was for the residence of Mele's mother-in-law, firefighters did not stage until law enforcement cleared the scene for their safety.  Instead, they entered immediately.

69.     Inside the garage Rosario assessed Sheila Hamner and confirmed she was deceased (as police officers walked thru the garage with their guns drawn).

70.     Rosario observed blood all over the place. Mele was inconsolable.

71.     Plaintiff was seated on the ground outside the garage "crying and very emotional." Rosario stated:  "In my mind it looked like [Kenneth Hamner had] defensive  wounds" to the forearm.

72.     Rosario described Plaintiff as "in shock or something."  Plaintiff's injuries were bandaged and he was moved away from the residence, for safety.

73.     When Plaintiff was placed on a stretcher, Rosario observed some red marks on the back of Plaintiff's head.  The injuries did not look like a knife wound.

74.     Firefighter paramedic Anthony Fitzpatrick (hereinafter "Fitzpatrick") described Plaintiff emotionally as "kind of in shock," and screaming that he "couldn't help her."

75.     Fitzpatrick heard Plaintiff explain that he felt something strike him on the back or hit

him in the back, at which time he was stabbed.   On the back of Plaintiff's head just above the neck Fitzpatrick observed minor abrasions that looked like he may have been struck or hit in that area.

76.     Firefighter EMT Christopher Losee heard Lieutenant Mele questioning Plaintiff, asking: "What the fuck happened, Ken?"  Plaintiff answered that he did not know.

77.     Mele later explained that when deputies asked Plaintiff for a description of the perpetrator, he said it was a Hispanic male wearing dark clothes.

78.     Plaintiff provided the same description to deputy sheriff Lieutenant Andrew McIntosh, who stated: "I asked Kenny what who [sic] the person was. Kenny stated he did not know. Kenny described the person to me as an hispanic male, wearing a dark shirt and dark pants.  Kenny was then transported by rescue personnel to the hospital for treatment."

79.     The initial 911 call made by Wilson came in at 3:41 pm.  The 911 notes state:  "son came out of the house screaming that someone just stabbed his mother//trying to get additional . . . .son has blood all over his arm//son went to the back of the house//believes the mother is beh[ind] the garage."

80.     At 3:43 pm, 911 noted: "they are saying she is dead and susp[ect] is poss[ibly] inside the house a bm with knife and is still inside."

81.     At 3:45 pm, 911 noted: "son is sitting in the back screaming//the female that was stabbed is inside the garage and there is a pitch fork broken off in her. . . "  (In fact, the was never a pitch fork located on or near the body of Sheila Hamner)

82.     At 3:46 pm, 911 noted: "caller now is not sure about a bm has not seen a bm. . .  son is standing at the door screaming and mother is inside the door//he has blood on his arm."

83.     At 3:48 pm, the dispatcher notes state: "karen is my caller and she lives x street. . . . Latino drk skin male and dark clothes."

84.     At 3:49 pm, the dispatcher notes state: "Fresh feces," which refers to the fresh feces located by deputy Heather Wonderly (hereinafter "Wonderly") in the shower stall (next to the toilet) in the west side of the (partitioned) garage.

85.     Deputy Travis Bell (hereinafter "Bell") took a perimeter location south of the Hamner's residence.   While on the north bank of the canal that runs east-west behind the Hamner residence Bell observed fresh slide marks coming directly from the back yard of the residence.  The marks were located approximately 15-20 east of the storage shed positioned directly south of the garage (and the area where the feces was discovered by Wonderly.  The tracks were fresh and showed no sign of being covered by brush or erosion due to water (i.e., rain).  (See aerial photograph of Hamner residence, attached hereto as Exhibit "D")

86.     Bell noted that the chained linked fence along the canal bank had been knocked down in that area and that there were corresponding fresh shoe prints on the south bank of the canal that went in a southernly direction (away from the canal, towards Midway).  Bell passed the information along to dispatch and put the information out over his police radio several times while on scene.

87.     Corresponding with Bell's observations, at 3:53 pm the dispatcher's notes state: "Fresh tracks directly behind the house."

88.     At 3:56 pm, the dispatcher's notes state: "behind pool store, aban[doned] trailer, keep an eye out . . . can see tracks over canal SB."

89.     At 4:37 pm, the dispatcher's notes state: "1012 with victims son at the ER - suspect descp hm - short drk hair 5'6-5'8 / late 20-30 lsw drk clothing with bright design or lettering on front of shirt poss jeans but not shorts/ Is in back of the door of the laundry rm by garage door s0 with a large knife poss like a machete".

90.     At all times material hereto, Defendant MORASH was the lead case investigator and

Defendant WENTZ was the co-lead case investigator.

91.     Defendant BRENNAN and Sergeant Mark Colangelo (hereinafter "Colangelo") made contact with Plaintiff at Lawnwood Regional Medical Center prior to the time Plaintiff was taken into surgery.

92.     At 4:41 pm, Plaintiff was interrogated at Lawnwood Regional Medical Center by Defendant BRENNAN and Colangelo.  During the interrogation, Hamner stated:

> And I was screaming, and I felt something like hit, hit my back or something and I looked up and I saw somebody standing there (Unintelligible) and he swung at me.  (crying) then I realized, as I was screaming he was just looking at me.  He went to raise it again and I ran out and I ran to the road and started screaming, "Somebody call 911!"

93.     At the hospital, Plaintiff denied any injuries to his back, stating: "I don't think so cause they checked me."   At that time, Plaintiff was unaware of the visible injuries on the back of his head, just above the neck.  The injuries to Plaintiff's head (just above the neck) were photographed in the hospital by crime scene investigators. (See photograph of the back of Kenneth Hamner's head and neck, taken at Lawnwood Regional Medical Center, attached hereto as Exhibit E).

94.     During the interrogation by Defendant BRENNAN and Colangelo, Hamner was asked for a description of the assailant, and explained:

> He was dark hair, dark skin.  I think he was Mexican.  He could have been black, but I think he was Mexican or Spanish.

* **

> He could be black, but he was (Unintelligible) it was just so quick.

95.     Plaintiff explained that "he had dark clothes" and his hair was "kind of short."

96.     Plaintiff was then taken into surgery and defensive injuries to his forearm were

repaired under general anaesthesia.

97.     At 5:20 pm, Kody Bunch called 911.  The dispatch note states:  "Kody Bunch calling in from Coggin Mercedes advising he believes the suspect is a male named carlos alanaro (unk[nown] exactly how to pronounce last name)//advising that male [sic] befriended the victim recently and she wanted nothing to do with him and he believes he did this because of that//compl is working in the detail section ibo [in back of] the mercedes benz services area right now and would like 1025 to give the info."  (The statement that "she wanted nothing to do with him" refers to Dana Lorena Gates, the girlfriend of Kody Bunch)

98.     At 5:30 pm, the dispatcher's notes states: "123 will be sending a det[ective] to mercedes" in reference to interviewing Kody Bunch (hereinafter "Bunch").

99.     On December 10, 2016, with a police helicopter circling the area, Defendant MORASH traveled to Coggin Mercedes (a distance of approximately ½ mile from 379 Traub) to speak with Bunch in person.  Bunch explained that he previously worked with Arellano at Burger King and that he was mentally off and violent.

100.     Bunch told the detective that his girlfriend Dana Gates was the victim of a recent burglary committed by Arellano after meeting him in anger management class.

101.     Bunch stated that Arellano lived in a nearby trailer park and was a short Hispanic male, 5'6" - 5' 8", 140-150 lbs, with short black curly hair.   Bunch described Arellano as Puerto Rican or Mexican.  (The description provided by Bunch matched the description of a Hispanic male provided by Plaintiff at the crime scene as well as the description provided by Plaintiff at Lawnwood Regional Medical Center)

102.     Bunch alleged that Arellano was on the run from law enforcement (due to the burglary of Dana Gates's residence) and living in the woods in the area of Traub Avenue and carried

a large knife.

103. At the Hamner residence, crime scene investigators focused initially on the east side of the partitioned garage (where the body of Sheila Hamner was located near the washer and dryer), and collected blood swabs and latent fingerprints.

104. At 7:20 pm, the medical examiner determined the temperature inside the garage was 74 degrees.   At 7:25 pm, Sheila Hamner's core body temperature was 92 degrees.

105. At all times material hereto, Defendant WENTZ and Defendant MORASH knew that the determination of time of death based on core body temperature was unreliable, and only a general guide.

106. At all times material hereto, Defendant WENTZ and Defendant MORASH knew that, on average, and without considering a substantial number of variables (including weather conditions, clothing, etc.), core body temperature decreases post-mortem at a rate of 1.5 degrees her hour, on average.

107. At all times material hereto, Defendant WENTZ and Defendant MORASH knew that a core body temperature of 92 degrees was fully consistent with a time of death of 3:00 pm (or earlier) to 3:22 pm (or later).

108. At the time of the homicide, press releases from Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE stated that deputies were searching for a man last seen carrying a large knife or machete.  He was described as a 5-foot-8-inch Hispanic man wearing jeans and a dark shirt with bright print.

109. On the morning of December 11, 2016, crime scene investigators expanded their evidence collection to the west side of the partitioned garage.  Blood was located on the door knob between the east and west sides of the garage.  A bloody latent fingerprint was found on the area of

the door jam just inside the west side of the garage, near an adjacent closet.  A latent fingerprint was also recovered from a light bulb.  Dasani water bottles were found inside the garage and collected as evidence.

110.    On December 11, 2016 Plaintiff was visited by Defendant BRENNAN at Lawnwood Regional Medical Center.

111.    Plaintiff was presented with a six-person photograph lineup that included Arellano's booking photograph. Plaintiff was unable to positively identify Arellano as the perpetrator. Defendant BRENNAN explained to Plaintiff that "a couple sleep patterns" could "make things a little clearer in your mind."

112.    Interviews were also conducted with all the family members.

113.    On December 11, 2016, Defendant WENTZ and Defendant MORASH interviewed Rick Hamner.  During the interview Defendant WENTZ and Defendant MORASH learned for the first time that "a couple of weeks earlier" Sheila Hamner thought there was a shadow outside the house.  The incident was a matter of serious concern in the Hamner family, and Sheila Hamner was urged by her family to keep all the doors to the house locked.

114.    On December 12, 2016, Plaintiff was interrogated by Defendant BRENNAN and Detective Stephen Sigmon at Lawnwood Regional Medical Center.  Plaintiff explained that when he first came upon his mother's body he "didn't even realize there was blood, cause I really thought it was just a heart attack at first" (referring to the fact that Sheila Hamner had a prior history of heart problems).

115.    Plaintiff further told Defendant BRENNAN: "Like I said, I, I– and like something touched me on the back and that's whenever I looked up and stood up and he–I, I didn't even realize he cut me or hit me, but till afterwards."

116.    Defendant BRENNAN asked Plaintiff where the assailant came from, Plaintiff explained that "to my knowledge he was not behind me.  I am saying that something felt like it had grazed my back."  Plaintiff further explained to Defendant BRENNAN that after he was attacked, the assailant "backed to the door" that separates the east and west sides of the garage.

117.    During the questioning by Defendant BRENNAN on December 12, 2016, Plaintiff stated that when he returned to the garage he was holding the pole or pipe used to prop up the mailbox with one hand.  With the other hand, he attempted to pull his mother from the garage (due to the possibility the attacker was still inside) but her body was too large to move with one hand.

118.    In an effort to locate the murder weapon (and recover all other evidence), Defendant WENTZ obtained a search warrant for the residence and curtilage at 379 Traub.  An extensive search followed, including the removal of every item from the garage and digging up an old septic tank located on the property.  After nine (9) days of searching the murder weapon was not located.

119.    Every knife inside the Hamner residence was tested for traces of blood.  All tests were negative.

120.    On December 13, 2016, an arrest warrant affidavit was issued charging Carlos Gilbert-Arellano-Ramirez with burglary, theft, and stalking (for the conduct occurring on December 7, 2016 at the residence of Dana Lorena Gates).  Bond was set at $25,000 on the burglary charge with an additional bond of $1,500 (total) for the theft and stalking charges.

121.    On December 19, 2016, Plaintiff was again interrogated. By that time, the investigation was squarely focused on Plaintiff and the questioning was conducted by Defendant WENTZ and Defendant MORASH.

122.    By December 19, 2016, Defendant WENTZ and Defendant MORASH incorrectly concluded that Plaintiff murdered Sheila Hamner, and informed Plaintiff's brothers and sisters that

Plaintiff "killed your mom."

123.    Lisa Hamner DiFrancesco was told by Defendant WENTZ and Defendant MORASH that by the time Plaintiff was Facebooking (with Lisa Hamner DiFrancesco and others on line) "your mom was already gone," and that there was a one (1) hour delay to the time of the 911 call.   Lisa Hamner DiFrancesco was also falsely informed that there was no possibility or trace evidence of anybody else being inside the garage. Defendant WENTZ and Defendant MORASH informed Plaintiff's brothers and sisters that they could not reveal all the evidence against Plaintiff at that time.

124.    During the interrogation on December 19, 2016, Plaintiff again explained that "I don't know if it was the wind, or what, but it was like something just–um–I felt something on my back, and that's whenever I stood up and looked up and there was, the next thing I knew he swung at me with something.

125.    Plaintiff stated that the assailant came from the area of the doorway that separated the east and west sides of the garage (and unbeknownst to Plaintiff, near where the bloody latent fingerprints were recovered)

126.    Plaintiff explained again that he "didn't know [he] was cut.  And [the assailant] backed up from me and he was right near the doorway that goes into the other part," i.e., the west side of the garage, adjacent to where the bloody latent fingerprints were located.

127.    During the questioning on December 19, 2016, Plaintiff was again asked by Defendant WENTZ and Defendant MORASH to provide a description of the assailant:

> Oh God.  He appeared to be a Mexican looking guy with dark hair.  He seem to have dark clothes, and as I told the original detectives when they were asking me, I felt like there was some kind of writing but I (Unintelligible) couldn't quite make it out and what it was.  And I tried so hard, cause they asked me, please try really hard. Sometimes within twenty-four, forty-eight hours the things come back to you.  I've tried so hard to see his face and I can't see anything more than that.  He did not seem like somebody I knew. . . . [A]nd when he raised that, and, and then I–and I backed

out [of the garage] he just seemed so calm.  That was the one thing that stuck out to me a day later whenever they were asking me.  And I– and the–and then the detectives were trying to – they say," Can you remember whether he was right handed or left handed? I swear laying in the hospital for two days I tried to concentrate so hard, and I wanted to say right handed, but . . . I'm not a hundred percent sure.  I don't know that he's a , a hundred percent Mexican. That's just the best description that came to my mind with regards to what I thought he looked like. . . . . .

* * *

[M]y original thought was it was just a big knife, cause it was like not small, but it wasn't huge.  I mean the way that he, he kind of swung at me, you know again, the detectives had me to keep thinking, keep thinking, keep thinking.  I don't know, was it a machete, or if it was a – something larger or shorter, but I mean it didn't seem like a routine pocket knife, but I don't know what it was.  I don't now what it was.

128.    On December 21, 2016, David and Diane Gates (the parents of Dana Lorena Gates) returned to their residence 419 Anchor Way, Fort Pierce, Florida. They were in the pool area at the back of their residence with a guest when they observed footprints and items out of place.

129.    Underneath the patio bar the Gates's discovered Arellano hiding behind a cooler and trash can.  There was a large knife in a leather sheath hung from the right side of Arellano's waistband.  Arellano said he was homeless and was permitted to leave on foot.

130.    A subsequent investigation determined that Arellano made entry into the patio area by cutting the screen.  He left behind a bag the Gates's had given to their daughter.  It was the same bag taken in the burglary of their daughter's residence on December 7, 2016.  Inside the bag was a watch taken in the prior burglary, night vision goggles, a ski mask, and pepper spray.

131.    Prior to December 21, 2016, Arellano had no prior contact with David or Diane Gates.  The burglary was not a random act.  The address of 419 Anchor Way was  approximately ten (10) miles north of Arellano residence and Traub Avenue.

132.    On December 22, 2016, Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE

deputy Christopher Newman (hereinafter "Newman") filed an arrest affidavit charging Arellano with burglary of the residence of David Gates and Diana Gates. (Newman was one of the detectives who assisted Defendant WENTZ and Defendant MORASH with the investigation of the crime scene on December 10th and 11th and the search for evidence at the Hamner residence)  A warrant was issued for Arellano's arrest.  Bond was set at $50,000.

133.    On December 28, 2016, the fingerprints of Kenneth Hamner, Sheila Hamner, and Joel Johnson were examined by crime scene investigator Bridget Coghlan and excluded as the source of the bloody prints located on or near the doorway between the east and west sides of the garage.

134.    At all times material hereto, the fingerprints of Arellano were on file due to his prior arrest by Defendant MORASH, but were not submitted to Coghlan for comparison.

135.    During the detectives interviews with family and friends of Sheila Hamner, Plaintiff and Sheila Hamner were regularly and routinely described as "best friends."

136.    Plaintiff explained to Defendant WENTZ and Defendant MORASH :  "I'm fifty-two years old and I'm the biggest Momma's boy in the world and I'm okay with that."

137.    There was no history of domestic violence at the Hamner residence.  When Marcia Mele (Plaintiff's oldest sister and the wife of Lieutenant David Mele) was asked by Defendant WENTZ and Defendant MORASH if Plaintiff was ever violent with his mother, she responded: "Oh God, no."

138.    Marcia Mele (and others) informed Defendant WENTZ and Defendant MORASH that there was a history of homeless persons living in the woods behind the residence, and there were people walking in the neighborhood all the time (on their way to the stores on Midway and U.S. 1). A fire was recently set in the woods behind Traub and was extinguished by the fire department.

139.    Kevin Hamner described "running off" a squatter who was living in the woods

approximately 18 months earlier. (The squatter was known to Kevin Hamner as a former employee of an air conditioning company that did work on the Hamner's residence)

140. Bob Pavelski (hereinafter "Pavelski") performed with Plaintiff in the band State Road 70. When questioned by detectives Pavelski stated that Plaintiff weighted approximately 315 pounds and was trying to lose weight. Notwithstanding his size, Pavelski explained that "Kenny's not the kind of guy to do harm to anybody." He described Plaintiff as a "kind of a pussy" and "a little on the girly side."

141. Kevin Hamner described Plaintiff as "not a fighter" and "timid."

142. Friends and family members generally described Plaintiff as "dramatic". Raymond Noel (hereinafter "Noel") knew Plaintiff for 30 years and performed with him in both the Wild Card band and State Road 70. Noel explained to detectives that the Plaintiff's dramatic flair carried over to his singing, describing him as "a hell of a performer."

143. Noel advised detectives that there was "no way possible" Plaintiff was involved in his mother's murder. Noel stated that "they were inseparable," and Sheila Hamner was her son's "best friend."

144. Based on the foregoing, Defendant WENTZ and Defendant MORASH falsely, or in reckless disregard for the truth, concluded that Plaintiff murdered his mother and then stabbed himself in a failed attempt to cover up the crime.

145. Defendant WENTZ and Defendant MORASH falsely, or in reckless disregard for the truth, alleged that after Sheila Hamner returned home from WalMart and Publix at approximately 2:10 p.m. she was ambushed and killed by Plaintiff near the door to the garage.

146. Defendant WENTZ and Defendant MORASH falsely, or in reckless disregard for the truth, alleged that Plaintiff hid the murder weapon and went on Facebook at approximately 3:32 pm.

to thank friends for coming out the prior evening to watch Plaintiff perform with the band State Road 70 at the Midtown Grill and Bar. Plaintiff then returned to the garage where Plaintiff used his used his non-dominant left hand to stab himself in his (dominant) right forearm.  Plaintiff again hid the weapon used to harm himself and ran into Traub Avenue screaming for help, albeit, leaving only a single blood trail from the location of his mother's body to Traub Avenue (and directly back to the garage).

147.    Defendant WENTZ and Defendant MORASH  falsely, or in reckless disregard for the truth, alleged that a wheel barrow used by Sheila Hamner for lawn work (and semi-filled with dirt, wood, and debris) was positioned by Plaintiff in the breezeway between the house and garage to haul off his mother's body from the crime scene, but that the plan was abandoned.  Also located in the breezeway was an empty laundry basket with substantial blood stains.

148.    At all times material hereto, Defendant WENTZ and Defendant MORASH offered no explanation for why Plaintiff abandoned the alleged plot to use the wheel barrow to dispose of his mother's body, and instead, stabbed himself in the right forearm (using his non-dominant left hand).

149.    Defendant WENTZ and Defendant MORASH  falsely, or in reckless disregard for the truth, accused Plaintiff of falsely alleging that a black man committed the crime, and then changed his story by claiming it was a Hispanic or Mexican male who, in reality, never existed.

150.    The allegation by Defendant WENTZ and Defendant MORASH that Plaintiff was the actual perpetrator and falsely accused a black man or Hispanic or Mexican male who, in reality, never existed, was objectively unreasonable.  Every reasonable investigator in the position of Defendant WENTZ and Defendant MORASH would have had serious doubts that Plaintiff was the actual perpetrator.

151.    Defendant WENTZ and Defendant MORASH knew that within hours of the murder of Sheila Hamner, the name of Carlos Gilbert Arellano-Ramirez was provided to law enforcement by Bunch.

152.    Defendant MORASH personally interviewed Bunch while a police helicopter was still circling the area, and knew Arellano (having arrested him the prior year for child abuse).

153.    Defendant WENTZ and Defendant MORASH knew that Arellano matched the physical description of the actual perpetrator and knew he was in hiding from the police and possibly living in the woods behind Traub due to the arrest warrant issued for the burglary of Dana Lorena Gates's residence on December 7, 2016.

154.    Defendant WENTZ and Defendant MORASH knew that Arellano was known to be violent and carried a knife, and was described as "mentally off."

155.    Defendant WENTZ and Defendant MORASH knew that following the burglary of Dana Gates's residence, Arellano traveled ten (10) miles north to target the residence of Gates's parents (in retaliation for Dana Gates calling the police after the burglary of her residence). When Arellano was discovered in the backyard pool area of the residence of Gates's parent hiding underneath the patio bar he was wearing a sheath with a knife on his right hip, and carrying night vision goggles and pepper spray.

156.    Defendant WENTZ and Defendant MORASH knew the evidence supporting the conclusion that Plaintiff was at all times truthful was substantial.   Plaintiff sustained a deep laceration to his dominant (right) forearm (meaning he would have had to stab himself with his non-dominant left hand).   The wound was severe and bleeding.   Plaintiff also had an injury to the back of his head (that Plaintiff himself was unaware of) that was observed by the fire-rescue personnel and photographed at the hospital by crime scene investigators.

157.     Defendant WENTZ and Defendant MORASH knew the injury to Plaintiff's forearm was a classic defensive wound (as described by firefighter-paramedic Rosario).

158.     Defendant WENTZ and Defendant MORASH knew there was no evidence that Plaintiff brutally stabbed and killed his mother (it was an extremely bloody crime scene) and cleaned himself (without a trace) before entering the house and using Facebook, all without leaving a single drop of blood or blood trail inside the residence.

159.     Defendant WENTZ and Defendant MORASH knew that neither the murder weapon nor the weapon used in the attack on Plaintiff were recovered (suggesting that the actual killer left the crime scene with the knife), notwithstanding an extensive multi-day search.

160.     Defendant WENTZ and Defendant MORASH knew fresh footprints were located on both sides of the ditch behind the Hamner residence, consistent with the actual killer fleeing south towards Midway Avenue (as Plaintiff) ran north into Traub Avenue, screaming for help.

161.     Defendant WENTZ and Defendant MORASH knew fresh feces was located in the shower stall on the west side of the garage by deputy Wonderly, and bloody fingerprints were located in the area of the garage where Plaintiff observed the assailant after being stabbed.

162.     Defendant WENTZ and Defendant MORASH knew Kenneth Hamner, Sheila Hamner, and Joel Johnson were excluded as the source of the bloody fingerprints. Nevertheless, Defendant WENTZ and Defendant MORASH thereafter failed to request that Bridget Coghlan compare the bloody prints to Arellano, notwithstanding the fact that Arellano matched the physical description of the perpetrator, was actively engaged in residential burglary in the area, and was known to carry a knife.

163.     Defendant WENTZ and Defendant MORASH thereafter requested that Plaintiff submit to a polygraph examination (i.e., lie detector).

164.    At all times material hereto, Defendant WENTZ and Defendant MORASH knew that polygraph examinations were unreliable, and as such, could not be used to support a finding of probable cause.

165.    Defendant WENTZ had a personal relationship with Rick Hamner, and requested that Rick Hamner drive Plaintiff to the polygraph exam.  Rick Hamner agreed.  Defendant WENTZ explained to Rick Hamner that "we can't use the lie detector– it's just a tool."

166.    Based on Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE policy and procedures (General Order 27.02 - Polygraph Examination), it is a relative contraindication for the administration of a polygraph exam if the subject of the polygraph has had "recent major surgery" or suffers from "emotional instability, especially if caused by a violent incident connected to the subject of the examination." Because Plaintiff had both "recent major surgery" under general anaesthesia, and was emotionally traumatized and unstable due to the murder of his mother and attempt on his own life, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM knew Plaintiff was not an appropriate candidate for a polygraph examination.

167.    Based on Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE policy and procedures (General Order 27.02 - Polygraph Examination), it is an absolute contraindication for the administration of a polygraph examination if the matter under investigation concerns a domestic dispute or the person to whom the polygraph examination is administered has been subjected to "extensive interrogations."  Because the allegations involved a domestic dispute and Plaintiff had been subjected to extensive police interrogation, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM knew Plaintiff was not an appropriate candidate for a polygraph examination.

168.    At all times material hereto, Defendant CULLUM was a deputy sheriff for Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE and a polygraph examiner.

169.   The polygraph examination was administered by Defendant CULLUM on December 19, 2016 at the request of Defendant WENTZ and Defendant MORASH.

170.   Following the polygraph examination Plaintiff was advised by Defendant CULLUM that it was the worst score he had ever seen, when in fact, as Defendant CULLUM knew, the entire polygraph examination was either a ruse, or as Defendant MORASH, Defendant WENTZ, and Defendant CULLUM knew, Plaintiff was not an appropriate candidate for a polygraph examination in the first instance.

171.   Following the polygraph examination, Defendant CULLUM and Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE failed to retain the raw data used by Defendant CULLUM to score the examination and conclude that Plaintiff showed deception (when in fact, he did not).

172.   On January 3, 2017, Defendant WENTZ, Defendant MORASH, Defendant MCINTOSH, Defendant BRENNAN, and Defendant CULLUM, proximately caused the issuance of warrant for the arrest of Plaintiff for first degree murder of Sheila Hamner, in the absence of probable cause.  The arrest warrant affidavit was signed by the co-lead investigator, Defendant WENTZ.

173.   On January 3, 2017, Plaintiff was taken into custody outside the Walgreens on the corner of Midway and U.S. 1.  Plaintiff was thereafter held with no bond.  Defendant MORASH directed the arrest (which was performed by uniformed road patrol deputies), and prepared the arrest affidavit documenting the execution of the arrest warrant.

174.   Plaintiff was transported to the St. Lucie County Jail, where he was held without bond.  While Plaintiff was in the medical unit he was visited by the Sheriff, Kenneth J. Mascara. Sheriff Mascara knew Plaintiff was the singer for the band Wild Card, and stated: "We have a singer here.  We can start a blues band."

175. At all times material hereto, there was no evidence Plaintiff committed the offense of first degree murder, and the arrest warrant affidavit submitted by Defendant WENTZ with the assistance of Defendant MORASH was insufficient to establish probable cause.

176. Because there was a lack of any evidence that Plaintiff committed the first degree murder of Sheila Hamner (because he did not) and stabbed himself to cover up the crime (because he did not), the arrest warrant affidavit focused substantially on Plaintiff's perceived mental and emotional response to the incident, to wit: 1). Plaintiff cried without the production of sufficient tears in the immediate aftermath of the incident, and/or when interviewed in the hospital by Defendant BRENNAN, or 2). Plaintiff stopped crying, such as when Kimberly Taylor accused Plaintiff of being the killer (i.e., after her boyfriend Johnson circled the garage and did not find any other person), when in fact, as Defendant MORASH, Defendant WENTZ, and Defendant BRENNAN knew, persons who suffer a grievous personal loss (i.e, murder of a family member) and/or have been the victim of a violent crime are often emotionally upset (or inconsolable), sometimes intermittently, with or without the production of a specific quantity of tears.

177. At all times material hereto, as Defendant MORASH, Defendant WENTZ, and Defendant BRENNAN knew, persons (like Plaintiff) who are described as being in "shock" (as reported by firefighter-paramedic Fitzpatrick) due to the murder of a family member and are (wrongfully, it turns out) accused of the murder should not be expected to display a uniform and "correct" emotional reaction, and the allegation by Defendant MORASH, Defendant WENTZ, and Defendant BRENNAN that Plaintiff's emotional reaction was evidence of wrongdoing was intentionally false or made in recklessly disregard for the truth, and necessary for a finding of probable cause (since there was no actual evidence of wrongdoing).

178. Defendant MCINTOSH falsely alleged that upon arriving at the incident location he

questioned Plaintiff, who stated that upon entering the garage he was struck in the head, knocking him to the floor, when in fact, Plaintiff was questioned repeatedly at the scene of the incident and in the hospital and never stated he was knocked to the floor. The allegations in the arrest warrant affidavit provided by Defendant MCINTOSH, were intentionally false or made in recklessly disregard for the truth, and based on the lack of evidence against Plaintiff, and necessary for a finding of probable cause.

179.    Defendant BRENNAN falsely alleged that there were no noticeable injuries on Plaintiff's back or head, when in fact, Rosario and Fitzpatrick both observed injury to the back of Hamner's head prior to the time Plaintiff was transported to the hospital, and the injuries were photographed at Lawnwood Regional Medical Center by a crime scene investigator at the direction of Defendant BRENNAN (prior to the time Plaintiff was taken into surgery on December 10, 2016). The allegations included in the arrest warrant affidavit made by Defendant BRENNAN were intentionally false or made in recklessly disregard for the truth, and necessary for a finding of probable cause.

180.    Defendant WENTZ and Defendant MORASH falsely alleged that because Plaintiff's blood droplets were found on the far (west) side of a printer stored in the garage (i.e., on the side away from the location where the body of Sheila Hamner was found), and as such, Plaintiff was the actual perpetrator, insofar as Plaintiff denied entering any area in the garage except where Sheila Hamner's body was located, when in fact, as Defendant WENTZ and Defendant MORASH knew, the blood droplets on the printer were found almost exactly where Plaintiff alleged he observed the perpetrator standing in the moment after Plaintiff was stabbed), and as such, the fact that Plaintiff's blood droplets were found on the printer was fully consistent with blood transfer from the knife used by the perpetrator to stab Plaintiff in the right forearm. The allegations included in the arrest warrant

affidavit made by Defendant WENTZ and Defendant MORASH were intentionally false or made in recklessly disregard for the truth, and necessary for a finding of probable cause.

181. Defendant MORASH falsely alleged that Plaintiff was seen by his neighbor William West for with a knife sticking in his arm, when in fact, as Defendant MORASH knew, the claim was false not based on reasonably trustworthy information. Defendant MORASH knew that when Plaintiff returned to the garage he was holding a pole or pipe used to support the mailbox on Traub Avenue. When Johnson observed Hamner holding the pipe he told Hamner to drop it. Hamner complied. West nevertheless advised Defendant MORASH that at the time he approached the garage with Adams and Taylor, West was 99.7% sure for a brief second he observed a kitchen knife sticking thru Hamner's arm (but when he looked back the knife was gone and Hamner had a pole), when in fact, no knife was ever connected to Plaintiff and none of the other witnesses who arrived at the garage contemporaneously or before West (including Johnson who was face-to-face with Plaintiff at the garage, Adams and Taylor) observed a knife sticking out of Plaintiff's arm at any time, and no knife was recovered after an exhaustive multi-day search of the residence and property. The allegations included in the arrest warrant affidavit made by Defendant MORASH were intentionally false or made in recklessly disregard for the truth, and necessary for a finding of probable cause.

182. Defendant CULLUM falsely alleged that Plaintiff was deceptive on the polygraph exam, when in fact, as Defendant CULLUM knew, the allegations were false, since the polygraph examination was either a deliberate ruse or Plaintiff was never an appropriate candidate for polygraph examination in the first instance. The false allegation by Defendant CULLUM that Plaintiff showed signs of deception were intentionally or made in recklessly disregard for the truth, and necessary for a finding of probable cause.

183. The arrest warrant affidavit contained material omissions, including the fact that, as

Defendant WENTZ and Defendant MORASH knew, there was no history of violence towards Sheila Hamner by any of the her children (including Plaintiff), that Sheila Hamner was the queen of the family and treated as such by her children, and that Plaintiff was universally described by friends and family as non-violent (i.e., the terms used to describe Plaintiff were "timid," "pussy," "momma's boy"), and his mother's "best friend."

184.   The arrest warrant affidavit contained material omissions, as Defendant WENTZ and Defendant MORASH knew, insofar as the affidavit omitted the material fact that several unidentified bloody fingerprints were located on the north side of the door frame on the west side of the laundry room and on the wall on the west side of the garage (in the area where Plaintiff observed the actual perpetrator standing immediately after being stabbed in the forearm). Defendant WENTZ and Defendant MORASH also failed to submit the known fingerprints of Carlos Gilbert Arellano-Ramirez for comparison prior to seeking a warrant for the arrest of Plaintiff for murder in the first degree, and omitted in the warrant affidavit that the fingerprints of Arellano were on file but not submitted for comparison. (Subsequently, the latent fingerprints located on the north side of the door frame on the west side of the laundry room (in the area where Plaintiff observed the actual perpetrator after he was stabbed) and adjacent wall in the west side of the garage were positively identified by fingerprint analysts as Arellano's fingerprints)

185.   The arrest warrant affidavit contained material omissions, as Defendant WENTZ and Defendant MORASH knew, insofar as the affidavit omitted the material fact that a latent fingerprint was located on one of the Dasani water bottles found inside the garage.  Defendant WENTZ and Defendant MORASH failed to submit the known fingerprints of Arellano for comparison prior to seeking a warrant for the arrest of Plaintiff for murder in the first degree, and omitted in the warrant affidavit that the fingerprints of Arellano were on file but not submitted for comparison.

(Subsequently, the latent fingerprint located on the Dasani water bottle found inside the garage was positively identified by fingerprint analysts as the fingerprint of Arellano)

186. The arrest warrant affidavit contained material omissions, as Defendant WENTZ and Defendant MORASH knew, insofar as the affidavit omitted the material fact that a latent fingerprint was located on a light bulb in the west side of the garage near some stored mattresses. Defendant WENTZ and Defendant MORASH failed to submit the known fingerprints of Carlos Gilbert Arellano-Ramirez for comparison prior to seeking a warrant for the arrest of Plaintiff for murder in the first degree, and omitted in the warrant affidavit that the fingerprints of Arellano were on file but not submitted for comparison. (Subsequently, the latent fingerprint located on the on a light bulb in the west side of the garage near some stored mattresses was positively identified as the fingerprint of Arellano)

187. The arrest warrant affidavit contained material omissions, as Defendant WENTZ and Defendant MORASH knew, insofar as the affidavit omitted the material fact that post-mortem (i.e., during the autopsy) unidentified DNA was recovered from under the fingernails of Sheila Hamner's right hand.

188. On January 23, 2017, Plaintiff was charged by information with second degree murder, in the absence of probable cause.

189. On February 14, 2017, Arellano was arrested by the U.S. Marshall's Fugitive Task Force and transported to Defendant ST. LUCIE COUNTY SHERIFF'S OFFICE detective bureau, where he was questioned by Defendant MORASH concerning the homicide of Sheila Hamner. Post-*Miranda*, Arellano falsely claimed that on the afternoon of the homicide he was eating spam in the woods in a tree cave when (from a distance of 60 feet) he heard a loud scream. A few seconds later he observed a Hispanic or Puerto Rican or black male wearing black, running though the ditch

behind the Hamner residence with a bloody knife. The person with the knife ran south towards an abandoned pool store on Midway.

190.    Arellano claimed that he subsequently observed police dogs and heard on a police radio that they were looking for a Hispanic male, so he went into hiding.  Arellano hid in an dilapidated light yellow-in-color double wide trailer home located at 382 E. Midway Road, south of the Hamner residence.

191.    The light yellow-in-color double wide trailer home described by Arellano faces south towards Midway Road, but sits back a distance (north) from Midway Avenue.  There was running electricity inside the property, but the roof of the structure was partially collapsed.  The property was listed for sale with A1 Realty.

192.    Following the interview on February 14, 2016, Defendant WENTZ and Defendant MORASH searched the woods south of the Hamner residence and located the "tree cave" described by Arellano (a tree with branches hanging down to the ground, forming an area that has the appearance of a cave).

193.    Following Defendant MORASH's interview with Arellano on February 14, 2017, and the discovery and search of the "tree cave," Defendant WENTZ and Defendant MORASH, knew that Plaintiff's description of a Hispanic male intruder inside the garage and armed with a knife was corroborated (by Arellano), and was consistent with the discovery of bloody latent fingerprints in the garage that did not match Plaintiff, Sheila Hamner, or Johnson. Nevertheless, Defendant WENTZ and Defendant MORASH failed or refused to obtain Plaintiff's release from confinement. As a result, Plaintiff remained in custody, without bond.

194.    On February 15, 2017, Arellano was again interviewed by Defendant MORASH.  At that time, Arellano claimed that he was no longer certain that the person he observed running

through the canal behind the Hamner residence was carrying a knife because he ran "really fast." Arellano was also no longer certain of the subjects race, stating only that the person could be dark skinned Hispanic or black, possibly Cuban or Puerto Rican.  After seeing the person running, Arellano claimed he went to the area of an abandoned pool store and hid all night in what he described as a "water tank."

195.    Based on the interview on February 15, 2017, Defendant WENTZ and Defendant MORASH knew Arellano's description of a Hispanic or possibly black male intruder inside the garage corroborated Plaintiff's claims, and was consistent with the discovery of the bloody latent fingerprints inside the garage that did not match Plaintiff, Sheila Hamner, or Johnson. Nevertheless, Defendant WENTZ and Defendant MORASH failed or refused to obtain Plaintiff's release from confinement.  As a result, Plaintiff remained in custody, without bond.

196.    On March 1, 2017, Defendant MORASH requested that Arellano provide a DNA sample. Arellano refused. At that time, Arellano informed Defendant MORASH that his prior statements were untruthful.

197.    Arellano then claimed that he was "invited" by Sheila Hamner to stay in the garage and was inside the closet and knew who killed Sheila Hamner, but would not talk further without a plea deal on his pending burglary charges (and related crimes).  Arellano explained that he knew from Sheriff Mascara's press conference following the arrest of Kenneth Hamner that Sheriff Mascara claimed Plaintiff described "a Hispanic male who frankly, never existed," Arellano stated to Defendant MORASH:  "I don't know Kenny, but I saw what Ken Mascara say about – about a dark skin Hispanic male with a - with whatever, with the white lettering on it.  Everything is fake."

198.    Arellano stated that he was "invited" to the residence by Sheila Hamner and provided bottles of water.  When Sheila Hamner left, Arellano defecated in the shower inside the garage

(because the  toilet was too dirty).  He then heard an argument between Sheila Hamner and Kenneth Hamner. A second white male (not Kenneth Hamner) was also present.

199.   Arellano alleged he was able to hear (but not see) Kenneth Hamner stab Sheila Hamner, and claimed that he recognized Hamner's voice (notwithsanding the fact Arellano and Hamner had no prior association). Plaintiff then threw the knife and left the garage, at which time Arellano exited the closet to render aide to Sheila Hamner, who was praying and said "help me, please, I don't want to die."  Arellano then changed his story and denied that a second white male (i.e., a person other than Kenneth Hamner) was inside the garage.

200.   Arellano tried to move Sheila Hamner but was unable because she was too heavy. He also searched her pockets looking for a cell phone to call 911, but only found keys. Arellano then heard Plaintiff returning and hid in the closet.   Arellano stated that he was wearing a black T-shirt and armed with a knife.

201.   Arellano claimed he observed Plaintiff on his knees next to Sheila Hamner crying, "Mommy, Mommy, no, no."  In fact, Plaintiff was known to refer to his mother as "Mommy."

202.   Arellano told Defendant MORASH that Plaintiff's actions made him mad and he came out of the closet and swung his knife at Plaintiff, hitting him in the forearm.   Arellano went to stab or slash Plaintiff again, but Plaintiff ran out of the garage yelling for help.  Arellano then fled out the back of the house, jumped the canal, and fled south the pool store where he hid the knifes and climbed into in an old chlorine vat located on the property.   From that location he remained undetected as law enforcement and K-9 searched the area.

203.   On March 2, 2017, crime scene investigator Bridget Coghlan was provided Arellano's fingerprint standards for the first time, and positively identified Arellano's fingerprints at the crime scene, including: Arellano's left thumb (located both on the north side of door frame adjacent to the

door between the east and west sides of the garage, and on the wall adjacent to the closet just south of the door between the east and west sides of the garage); left index finger (located on the Dasani water bottle located inside the garage); and, right thumb finger (located on the light bulb near mattress stored in garage).

204.    On March 3, 2017, knives, clothing and personal effects belonging to Arellano were located inside the dilapidated double wide trailer home at 382 Midway, and just west of the pool store.

205.    Sergeant Robert Pettit also located used baby wipes that appeared to have blood on them. The baby wipes were collected by crime scene investigator Donna Carmichael from the southeast bedroom of the trailer at 4:13 pm.  A presumptive test on one of the baby wipes was positive for blood.

206.    Based on the interview with Arellano on March 1, 2017, and subsequent investigation, including Arellano's conflicting accounts and admission that he stabbed Plaintiff inside the garage, Defendant WENTZ and Defendant MORASH knew that Plaintiff had been truthful, and the theory publically provided by Sheriff Mascara that Kenneth Hamner described "a Hispanic male who frankly, never existed" and stabbed himself to cover up the crime, lacked all evidentiary support.

207.    As Defendant WENTZ and Defendant MORASH knew, Arellano fit the description of the Hispanic male provided by Plaintiff, and admitted stabbing Plaintiff in the garage in the exact manner described by Plaintiff.

208.    As Defendant WENTZ and Defendant MORASH knew, Arellano's suggestion that he was invited to stay in the garage by Sheila Hamner and provided water was completely inconsistent with Sheila Hamner and her family's response to the appearance of a (possible) shadow

outside the residence, and the potential threat posed by persons entering the property (including homeless persons living in the woods behind the residence).  Nevertheless, Defendant WENTZ and Defendant MORASH failed or refused to obtain Plaintiff's release from confinement.  As a result, Plaintiff remained in custody, without bond.

209.    On March 30, 2017, the State Attorney's Office filed a nolle prosequi in the matter of *State of Florida v. Kenneth Dean Hamner*, at which time Plaintiff was released from custody.

210.    On or about May 19, 2017, DNA obtained from the suspected blood on the baby wipes (discovered at double wide trailer home at 382 Midway) was positively identified as the DNA of Plaintiff, Kenneth Hamner.

211.    On July 18, 2017, Billy Bullins (hereinafter "Bullins") advised Defendant MORASH that he was incarcerated with Arellano.  Bullins provided Defendant MORASH with two separate letters handwritten by Arellano.  The first letter was similar to the story Arellano initially provided Defendant MORASH. The second letter confessed to the murder of Sheila Hamner.  The handwritten letters were collected by crime scene investigator Coghlan.

212.    On July 19, 2017, Coghlan identified the latent fingerprint on the letters as matching the known fingerprints of both Arellano and Bullins.

213.    On July 25, 2017, Defendant WENTZ located a knife sheath under the back edge of an old boarded up house that was used as a real estate business.  The structure faces south and is west of the pool store on Midway (and approximately 140' feet north of the dilapidated double wide trailer home where the baby wipes were located on March 3, 2017).

214.    A water pump and softener system with an water aerator tank was discovered along the back of the building near the north-east corner of the structure.

215.    Defendant WENTZ located the knife sheath just under the edge of the building near

the water aerator tank.

216.    The water aerator tank was situated near the north-east corner of the building.  It was grey in color with a lid, and approximately 3' feet 4" tall and 3' feet 1 ½" inches wide.  The tank had air vent holes with wire mesh located just below the top lip of the tank (which was filled with dirty water). Pieces of a deteriorated black shirt were located inside the water container.

217.    On December 1, 2017, extract of the swabs of the right hand fingernails of Sheila Hamner were provided to DNA Labs International, located in Deerfield Beach, Florida.

218.    On December 3, 2017, Arellano used a Kiosk in the jail to request to speak with Defendant MORASH.

219.    On December 4, 2017, Arellano was interviewed by Defendant WENTZ and Defendant MORASH.  Arellano completed a detailed diagram of the crime scene, and stated he would provide the detectives with 50% of the evidence and keep the other 50% so they can find the killer, who Arellano described as an unknown third person (i.e., not Kenneth Hamner).  Arellano refused to talk further without a plea deal, and stated when from the closet he could see exactly where the killer hid the knife thorough a window.

220.    On December 7, 2017, Arellano advised Defendant WENTZ and Defendant MORASH that there was a video of the incident and that a friend of his made copies and provided the original to a reporter.

221.    On December 8, 2017,  Defendant WENTZ and Defendant MORASH picked up Arellano from the jail so he could show the detectives where the killer's knife was located.  Arellano directed the detectives to the ditch behind the Hamner's residence.  No knife was located.

222.    On January 29, 2018, Defendant MORASH submitted an application for a search warrant requesting handwriting exemplars from Arellano. In the search warrant affidavit, Defendant

MORASH wrote that while speaking with Arellano on December 8, 2017,

> Detective Wentz and I then confronted Arellano about lying several times to us, and numerous inconsistencies in his story. Inconsistencies that include changing his story from Kenny Hamner being the killer, to an unknown third person. Also the fact he claims he could see through a window, "the killer" fleeing from the garage even though he claims he was hiding in a closet which has no view of that window. Arellano maintained he was not involved in killing Sheila Hamner. Arellano made several statements about "knowing the truth," however stated he would not tell us. Arellano was returned to the jail after stating he did not want to answer any further questions.

223. On February 12, 2018, DNA International determined that the DNA under the right hand fingernails of Sheila Hamner matched the Y-DNA of Arellano.

224. On February 23, 2018, Kesha T. White of the Florida Department of Law Enforcement Questioned Documents Section positively identified the handwriting on the letters provided to Coghlan by Billy Bullins as the handwriting of Arellano.

225. On March 28, 2018, an indictment was issued by a grand jury in St. Lucie County, Florida, against Carlos Gilbert Arellano-Ramirez for the first degree murder of Sheila Hamner, aggravated battery with a weapon against Kenneth Hamner, and armed burglary of a dwelling with a battery (property of Sheila Hamner and/or Kenneth Hamner).

226. As of the date of the filing of this action, the charges against Arellano remain pending.

227. Following the indictment of Arellano, Kenneth J. Mascara, the Sheriff of St. Lucie County, conducted a press conference. Sheriff Mascara acknowledged the grand jury's indictment but refused to state publically that Plaintiff had been cleared of suspicion, notwithstanding the incriminating DNA evidence (i.e., Arellano's DNA under the fingernails of Sheila Hamner), and the fact that a grand jury indicated Arellano for the criminal conduct against both Sheila Hamner and Kenneth Hamner. Instead, when Sheriff Mascara was asked if Kenneth Hamner was no longer a

suspect, he stated: "I don't want to say anything about Kenny in that regard right now." As a result, public suspicion towards Kenneth Hamner for the murder of his mother, Sheila Hamner, has continued.

228. At all times material hereto, no reasonably cautious deputy in the position of Defendant WENTZ, could have believed there was probable cause Plaintiff was guilty of the murder of Sheila Hamner, as alleged in the arrest warrant affidavit.

229. At all times material hereto, Defendant WENTZ, Defendant MORASH, Defendant MCINTOSH, Defendant BRENNAN, and Defendant CULLUM, intentionally, or recklessly made misstatements or omissions necessary to support the allegation there was probable cause that Plaintiff committed the murder of Sheila Hamner, when in fact, he did not.

230. The conduct of Defendant WENTZ, Defendant MORASH, Defendant MCINTOSH, Defendant BRENNAN, and Defendant CULLUM, occurred under color of state law.

## CAUSES OF ACTION

### COUNT I
### MALICIOUS PROSECUTION CLAIM UNDER THE FOURTH AMENDMENT AGAINST DEFENDANT WENTZ, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant WENTZ, individually, in Count I, Plaintiff states:

231. Plaintiff realleges and adopts, as if fully set forth in Count I, the allegations of paragraphs 1 through 230.

232. The conduct of Defendant WENTZ proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

233. The criminal proceedings instituted or continued by Defendant WENTZ reached a bona fide resolution in Plaintiff's favor.

234. At all times material hereto, Defendant WENTZ knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

235. Plaintiff was arrested on January 3, 2017 and incarcerated without bond until March 31, 2017, and as such, Plaintiff's pretrial detention was far too long to be justified without legal process.

236. The conduct of Defendant WENTZ, as set forth herein, proximately caused Plaintiff's arrest and pretrial detention in violation of Plaintiff's clearly established rights to be free from unlawful seizure pursuant to legal process and malicious prosecution, contrary to the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

237. As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

238. As a further direct and proximate result of the conduct of Defendant WENTZ, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights. Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

    i.    Judgment for compensatory damages in excess of $ 30,000 dollars;

    ii.    Judgment for exemplary damages;

iii.    Cost of suit;

iv.    Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

v.    Trial by jury as to all issues so triable; and

vi.    Such other relief as this Honorable Court may deem just and appropriate.

**<u>COUNT II</u>**
**<u>MALICIOUS PROSECUTION CLAIM UNDER THE FOURTH AMENDMENT AGAINST
DEFENDANT MORASH, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983</u>**

For his cause of action against Defendant MORASH, individually, in Count II, Plaintiff states:

239.    Plaintiff realleges and adopts, as if fully set forth in Count II, the allegations of paragraphs 1 through 230.

240.    All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

241.    The conduct of Defendant MORASH proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

242.    The criminal proceedings instituted or continued by Defendant MORASH reached a bona fide resolution in Plaintiff's favor.

243.    At all times material hereto, Defendant MORASH knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

244.    Plaintiff was arrested on January 3, 2017 and incarcerated without bond until March 31, 2017, and as such, Plaintiff's pretrial detention was far too long to be justified without legal

process.

245.     The conduct of Defendant MORASH, as set forth herein, proximately caused Plaintiff's arrest and pretrial detention in violation of Plaintiff's clearly established rights to be free from unlawful seizure pursuant to legal process and malicious prosecution, contrary to the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

246.     As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

247.     As a further direct and proximate result of the conduct of Defendant MORASH, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

      i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

      ii.      Judgment for exemplary damages;

      iii.      Cost of suit;

      iv.      Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

      v.      Trial by jury as to all issues so triable; and

      vi.      Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT III**</u>
<u>**MALICIOUS PROSECUTION CLAIM UNDER THE FOURTH AMENDMENT AGAINST DEFENDANT MCINTOSH, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983**</u>

For his cause of action against Defendant MCINTOSH, individually, in Count III, Plaintiff states:

248.    Plaintiff realleges and adopts, as if fully set forth in Count III, the allegations of paragraphs 1 through 230.

249.    All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

250.    The conduct of Defendant MCINTOSH proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

251.    The criminal proceedings instituted or continued by Defendant MCINTOSH reached a bona fide resolution in Plaintiff's favor.

252.    Defendant MCINTOSH intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

253.    Plaintiff was arrested on January 3, 2017 and incarcerated without bond until March 31, 2017, and as such, Plaintiff's pretrial detention was far too long to be justified without legal process.

254.    The conduct of Defendant MCINTOSH, as set forth herein, proximately caused Plaintiff's arrest and pretrial detention in violation of Plaintiff's clearly established rights to be free from unlawful seizure pursuant to legal process and malicious prosecution, contrary to the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

255.    As a direct and proximate result of the acts described above, in violation of 42 U.S.C.

§ 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

256.   As a further direct and proximate result of the conduct of Defendant MCINTOSH, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

      i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

      ii.      Judgment for exemplary damages;

      iii.      Cost of suit;

      iv.      Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

      v.      Trial by jury as to all issues so triable; and

      vi.      Such other relief as this Honorable Court may deem just and appropriate.

### COUNT IV
### MALICIOUS PROSECUTION CLAIM UNDER THE FOURTH AMENDMENT AGAINST DEFENDANT BRENNAN, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant BRENNAN, individually, in Count IV, Plaintiff states:

257.   Plaintiff realleges and adopts, as if fully set forth in Count IV, the allegations of paragraphs 1 through 230.

258.   All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

259. The conduct of Defendant BRENNAN proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

260. The criminal proceedings instituted or continued by Defendant BRENNAN reached a bona fide resolution in Plaintiff's favor.

261. Defendant BRENNAN intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

262. Plaintiff was arrested on January 3, 2017 and incarcerated without bond until March 31, 2017, and as such, Plaintiff's pretrial detention was far too long to be justified without legal process.

263. The conduct of Defendant BRENNAN, as set forth herein, proximately caused Plaintiff's arrest and pretrial detention in violation of Plaintiff's clearly established rights to be free from unlawful seizure pursuant to legal process and malicious prosecution, contrary to the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

264. As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

265. As a further direct and proximate result of the conduct of Defendant BRENNAN, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights. Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

     i.     Judgment for compensatory damages in excess of $ 30,000 dollars;

     ii.     Judgment for exemplary damages;

     iii.     Cost of suit;

     iv.     Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

     v.     Trial by jury as to all issues so triable; and

     vi.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT V
## MALICIOUS PROSECUTION CLAIM UNDER THE FOURTH AMENDMENT AGAINST DEFENDANT CULLUM, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant CULLUM, individually, in Count V, Plaintiff states:

266.    Plaintiff realleges and adopts, as if fully set forth in Count V, the allegations of paragraphs 1 through 230.

267.    All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

268.    The conduct of Defendant CULLUM proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

269.    The criminal proceedings instituted or continued by Defendant CULLUM reached a bona fide resolution in Plaintiff's favor.

270.    Defendant CULLUM intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

271.    Plaintiff was arrested on January 3, 2017 and incarcerated without bond until March

31, 2017, and as such, Plaintiff's pretrial detention was far too long to be justified without legal process.

272.   The conduct of Defendant CULLUM, as set forth herein, proximately caused Plaintiff's arrest and pretrial detention in violation of Plaintiff's clearly established rights to be free from unlawful seizure pursuant to legal process and malicious prosecution, contrary to the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

273.   As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

274.   As a further direct and proximate result of the conduct of Defendant CULLUM, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

    i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

    ii.     Judgment for exemplary damages;

    iii.    Cost of suit;

    iv.     Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

    v.      Trial by jury as to all issues so triable; and

    vi.    Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VI**
**PLAINTIFF'S FOURTH AMENDMENT POST-ARREST CLAIM AGAINST**
**DEFENDANT WENTZ, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendant WENTZ, individually, in Count VI, Plaintiff states:

275.    Plaintiff realleges and adopts, as if fully set forth in Count VI, the allegations of paragraphs 1 through 230.

276.    At all times material hereto, Defendant WENTZ knew that probable cause for Plaintiff's arrest was based on the allegation that Plaintiff committed the first degree murder of Sheila Hamner, and thereafter re-entered his residence to use Facebook (without leaving any trace of blood or other evidence inside the residence).

277.    At all times material hereto, Defendant WENTZ knew that probable cause for Plaintiff's arrest was based on the allegation that after the murder of Sheila Hamner Plaintiff stabbed himself in the right forearm with his non-dominant left hand to cover up the crime, and discarded the murder weapon (again without a trace).  Plaintiff then falsely alleged that "a Hispanic male" who never existed committed the crime.

278.    By February 14, 2017, following Defendant MORASH's interview with Arellano and the discovery and search of the "tree cave" by Defendant WENTZ and Defendant MORASH, Defendant WENTZ knew beyond reasonable doubt that probable cause for Plaintiff's arrest had dissipated, and failed and refused to seek Plaintiff's *immediate* release from confinement.

279.    By March 1, 2017, following Defendant MORASH's interview with Arellano, and Arellano's admission that he was inside the garage and stabbed Kenneth Hamner, Defendant WENTZ knew beyond reasonable doubt that probable cause for Plaintiff's arrest had dissipated, but failed and refused to seek Plaintiff's *immediate* release from confinement.

280.    At all times material hereto, Plaintiff had a right to be free from unreasonable seizure,

including post-arrest confinement in a jail (with no bond) after probable cause for the arrest has dissipated. Based on the post-arrest information obtained from Arellano, Defendant WENTZ knew beyond a reasonable doubt that probable cause no longer existed for Plaintiff's continued pretrial detention.

281. At all times material hereto, it was clearly established law that "[p]robable cause is required to *continue* a prosecution, not just arrest a defendant or to institute a prosecution." *Kjellsen v. Mills*, 517 F.3d 1232, 1238 (11th Cir. 2008) (italics in original). Concomitantly, a criminal defendant may not be subjected to pre-trial detention on the basis of a prosecution lacking in probable cause.

282. Alternative to the allegations set forth in Count I, if probable cause existed for the arrest of Plaintiff for first degree murder (and it did not), Defendant WENTZ knew the evidence obtained post-arrest demonstrated beyond a reasonable doubt that there was no longer probable cause to support the continued pre-trial detention of Plaintiff for the murder of Sheila Hamner.

283. The conduct of Defendant WENTZ towards Plaintiff was objectively unreasonable and violated Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 to be free from unreasonable seizure, i.e., post-arrest confinement in a jail (with no bond) after probable cause for the arrest has dissipated.

284. As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

285. As a further direct and proximate result of the conduct of Defendant WENTZ, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are

either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights. Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

      i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

      ii.      Judgment for exemplary damages;

      iii.      Cost of suit;

      iv.      Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

      v.      Trial by jury as to all issues so triable; and

      vi.      Such other relief as this Honorable Court may deem just and appropriate.

### COUNT VII
### PLAINTIFF'S FOURTH AMENDMENT POST-ARREST CLAIM AGAINST DEFENDANT MORASH, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant MORASH, individually, in Count VII, Plaintiff states:

286. Plaintiff realleges and adopts, as if fully set forth in Count VII, the allegations of paragraphs 1 through 230.

287. At all times material hereto, Defendant MORASH knew that probable cause for Plaintiff's arrest was based on the allegation that Plaintiff committed the first degree murder of Sheila Hamner, and thereafter re-entered his residence to use Facebook (without leaving any trace of blood or other evidence inside the residence).

288. At all times material hereto, Defendant MORASH knew that probable cause for Plaintiff's arrest was based on the allegation that after the murder of Sheila Hamner Plaintiff stabbed himself in the right forearm with his non-dominant left hand to cover up the crime, and discarded the murder weapon (again without a trace). Plaintiff then falsely alleged that "a Hispanic male" who

never existed committed the crime.

289.    By February 14, 2017, following Defendant MORASH's interview with Arellano and the discovery and search of the "tree cave" by Defendant MORASH and Defendant WENTZ, Defendant MORASH knew beyond reasonable doubt that probable cause for Plaintiff's arrest had dissipated, and failed and refused to seek Plaintiff's *immediate* release from confinement.

290.    By March 1, 2017, following Defendant MORASH's interview with Arellano, and Arellano's admission that he was inside the garage and stabbed Kenneth Hamner, Defendant WENTZ knew beyond reasonable doubt that probable cause for Plaintiff's arrest had dissipated, but failed and refused to seek Plaintiff's *immediate* release from confinement.

291.    At all times material hereto, Plaintiff had a right to be free from unreasonable seizure, including post-arrest confinement in a jail (with no bond) after probable cause for the arrest has dissipated.  Based on the post-arrest information obtained from Arellano, Defendant MORASH knew beyond a reasonable doubt that probable cause no longer existed for Plaintiff's continued pretrial detention.

292.    At all times material hereto, it was clearly established law that "[p]robable cause is required to *continue* a prosecution, not just arrest a defendant or to institute a prosecution." *Kjellsen v. Mills*, 517 F.3d 1232, 1238 (11th Cir. 2008) (italics in original).  Concomitantly, a criminal defendant may not be subjected to pre-trial detention on the basis of a prosecution lacking in probable cause.

293.    Alternative to the allegations set forth in Count II, if probable cause existed for the arrest of Plaintiff for first degree murder (and it did not), Defendant MORASH knew the evidence obtained post-arrest demonstrated beyond a reasonable doubt that there was no longer probable cause to support the continued pre-trial detention of Plaintiff for the murder of Sheila Hamner.

294.     The conduct of Defendant MORASH towards Plaintiff was objectively unreasonable and violated Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 to be free from unreasonable seizure, i.e., post-arrest confinement in a jail (with no bond) after probable cause for the arrest has dissipated.

295.     As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

296.     As a further direct and proximate result of the conduct of Defendant MORASH, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

ii.     Judgment for exemplary damages;

iii.    Cost of suit;

iv.     Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

v.      Trial by jury as to all issues so triable; and

vi.     Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VIII**
**CUSTOM, POLICY AND PRACTICE CLAIM AGAINST DEFENDANT**
**KENNETH J. MASCARA, AS SHERIFF OF ST. LUCIE COUNTY, FLORIDA,**
**COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE

COUNTY, Florida in Count VIII, Plaintiff states:

297.    Plaintiff realleges and adopts, as if fully set forth in Count VIII, the allegations of

paragraphs 1 through 230.

298.    At all times relevant to herein, Defendant WENTZ and Defendant MORASH were

acting under the direction and control of Defendant KENNETH J. MASCARA, as SHERIFF of ST.

LUCIE COUNTY, Florida, which was responsible for establishing policy for the lawful and

constitutional operation of the Sheriff's Office, and as such, Defendant WENTZ and Defendant

MORASH were acting pursuant to either official policy or the practice, custom, and usage of the

KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, the lack of official

policy, or a policy of inaction.

299.    Acting under color of law, by and through its policymakers, Defendant, KENNETH

J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, intentionally, knowingly, recklessly,

or with deliberate indifference to the constitutionally protected rights of others, disregarded known

and obvious risks under circumstances where the probability of constitutional violations were so

high, and the need for policies and training so obvious, that its failure to act and train its employees

constitutes deliberate indifference.

300.    At all times material hereto, Defendant, KENNETH J. MASCARA, as SHERIFF of

ST. LUCIE COUNTY, Florida, lacked official policies with regards to circumstances where, post-

arrest, the investigating officers obtained information establishing beyond a reasonable doubt that

the probable cause for the arrest dissipated.

301. At all times material hereto, detention in the jail is a type of seizure to which the protections of the Fourth Amendment apply, and as such, the continuation of even a lawful arrest violates the Fourth Amendment when police officers obtain evidence and information that dissipates their probable cause, regardless of whether criminal charges have been filed.

302. At all times material hereto, based on the official policy or the practice, custom, and usage of Defendant, KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, the lack of official policy, or a policy of inaction, Defendant WENTZ and Defendant MORASH failed to seek Plaintiff's immediate release from confinement once it was known, beyond a reasonable doubt, that probable cause to justify Plaintiff's arrest had dissipated.  As a result, Plaintiff remained incarcerated with no bond until March 31, 2017.

303. At all times material hereto, Defendant, KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida knew that the probable cause for Plaintiff's arrest turned on the theory that Plaintiff committed the first degree murder of Sheila Hamner and thereafter re-entered his residence to use Facebook, without leaving a trace of blood or other evidence inside the residence, and in an effort to cover up the crime, stabbed himself and discarded the murder weapon (again without a trace),  and thereafter, falsely accused "a Hispanic male" who never existed of the crime.

304. Following Defendant MORASH's interview with Arellano on February 14, 2017, and the search and discovery of the "tree cave" by Defendant WENTZ and Defendant MORASH, both Defendant WENTZ and Defendant MORASH knew beyond reasonable doubt that the probable cause for Plaintiff's arrest had dissipated, and failed and refused to seek Plaintiff's release from confinement.

305. Following Defendant MORASH's interview on March 1, 2017 and Arellano's

admission that he was inside the garage and stabbed Kenneth Hamner, Defendant WENTZ and Defendant MORASH knew beyond reasonable doubt that probable cause for Plaintiff's arrest had dissipated, but failed and refused to seek Plaintiff's release from confinement.

306. At all times material hereto, and as a direct and proximate result of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida's policy of inaction, Plaintiff remained incarcerated until March 31, 2017.

307. At all times material hereto, it is inevitable in large law enforcement agencies, including Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, that probable cause will dissipate post-arrest in some instances, sometimes even after criminal charges have been filed.

308. At all times material hereto, all persons held in custody under circumstances where probable cause for arrest has dissipated beyond a reasonable doubt are entitled to immediate release, regardless of whether criminal charges have been filed.

309. Defendant, KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, had the power to promulgate official policy and implement necessary training, and thereby prevent or aid in preventing the commission of said wrongs, could have done so, and intentionally, knowingly, or with deliberate indifference to the constitutionally protected rights of Plaintiff and others, failed or refused to do so. As a result, Plaintiff's incarceration continued after probable cause for arrest dissipated, in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

310. As a direct and proximate result of the acts described above, in violation of 42 U.S.C. § 1983, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation.

311.    As a further direct and proximate result of the conduct of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's clearly established civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable fee for his services herein.

WHEREFORE, Plaintiff prays:

  i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

  ii.     Cost of suit;

  iii.    Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

  iv.     Trial by jury as to all issues so triable; and

  v.      Such other relief as this Honorable Court may deem just and appropriate.

## COUNT IX
### NEGLIGENT REPORTING CLAIM AGAINST DEFENDANT, KENNETH J. MASCARA, AS SHERIFF OF ST. LUCIE COUNTY, FLORIDA

For his cause of action against Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida in Count IX, Plaintiff states:

312.    Plaintiff realleges and adopts, as if fully set forth in Count IX, the allegations of paragraphs 1 through 230.

313.    At all times material hereto, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM knew Plaintiff was not an appropriate candidate for a polygraph examination.

314.    At all times material hereto, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM knew Plaintiff had recent major surgery under general anaesthesia and was emotionally unstable due to a violent incident connected to the subject of the examination.

315.     At all times material hereto, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM knew the incident concerned an allegation of domestic violence and that Plaintiff was subjected to extensive police interrogation prior to testing.

316.     At all times material hereto, Defendant WENTZ, Defendant MORASH, and Defendant CULLUM owed Plaintiff a duty to exercise reasonable care in the reporting of the results of Plaintiff's polygraph examination.

317.     Defendant CULLUM beached his duty to Plaintiff by negligently finding that Plaintiff showed deception and was untruthful on the polygraph examination, when, in fact, Plaintiff was at all times honest and truthful at all times.

318.     As a foreseeable consequence of the conduct set forth herein, Defendant WENTZ reported in the arrest warrant affidavit executed on January 3, 2017, that Plaintiff showed deception and was untruthful on the polygraph examination. As a result, a warrant was issued for Plaintiff's arrest for first degree murder, resulting in Plaintiff's criminal prosecution.

319.     The conduct of Defendant WENTZ, Defendant MORASH, and Defendant CULLUM, as set forth herein, occurred during the course and scope of their employment as deputy sheriffs for Defendant, KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida.

320.     As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

321.     As a further direct and proximate result of the conduct of Defendant KENNETH J. MASCARA, as SHERIFF of ST. LUCIE COUNTY, Florida, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing

and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

  i.  Judgment for compensatory damages in excess of $ 30,000 dollars;

  ii.  Cost of suit;

  iii.  Trial by jury as to all issues so triable; and

  iv.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT X
## NEGLIGENT REPORTING CLAIM AGAINST DEFENDANT, CULLUM, INDIVIDUALLY

For his cause of action against Defendant CULLUM, individually, in Count X, Plaintiff states:

322. Plaintiff realleges and adopts, as if fully set forth in Count X, the allegations of paragraphs 1 through 230.

323. At all times material hereto, Defendant CULLUM knew Plaintiff was not an appropriate candidate for a polygraph examination.

324. At all times material hereto, Defendant CULLUM knew Plaintiff had recent major surgery under general anaesthesia and was emotionally unstable due to a violent incident connected to the subject of the examination.

325. At all times material hereto, Defendant CULLUM knew the incident concerned an allegation of domestic violence and that Plaintiff was subjected to extensive police interrogation prior to testing.

326. At all times material hereto, Defendant CULLUM owed Plaintiff a duty to exercise reasonable care in the reporting of the results of Plaintiff's polygraph examination.

327. Defendant CULLUM beached his duty to Plaintiff by negligently finding that Plaintiff showed deception and was untruthful on the polygraph examination, when, in fact, Plaintiff was at all times honest and truthful at all times.

328. As a foreseeable consequence of the conduct set forth herein, Defendant WENTZ reported in the arrest warrant affidavit executed on January 3, 2017, that Plaintiff showed deception and was untruthful on the polygraph examination. As a result, a warrant was issued for Plaintiff's arrest for first degree murder, resulting in Plaintiff's criminal prosecution.

329. Alternatively to the allegations set forth in Count IX, if the negligent conduct of Defendant CULLUM occurred outside the course and scope of Defendant CULLUM's employment, or was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, then the negligence conduct of Defendant CULLUM was committed in his individual capacity.

330. As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

331. As a further direct and proximate result of the conduct of Defendant CULLUM, individually, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

  i.  Judgment for compensatory damages in excess of $ 30,000 dollars;

  ii.  Judgment for exemplary damages;

  iii.  Cost of suit;

  iv.  Trial by jury as to all issues so triable; and

  v.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XI
## MALICIOUS PROSECUTION CLAIM UNDER FLORIDA LAW AGAINST DEFENDANT WENTZ, INDIVIDUALLY

For his cause of action against Defendant WENTZ, individually, in Count XI, Plaintiff states:

332.    Plaintiff realleges and adopts, as if fully set forth in Count XI, the allegations of paragraphs 1 through 230.

333.    At all times material hereto, Defendant WENTZ knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

334.    The conduct of Defendant WENTZ proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

335.    The criminal proceedings instituted or continued by Defendant WENTZ reached a bona fide resolution in Plaintiff's favor, in violation of Plaintiff's right to be free from malicious prosecution under Florida law.

336.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

337.    As a further direct and proximate result of the conduct of Defendant WENTZ, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

i.       Judgment for compensatory damages in excess of $ 30,000 dollars;

ii.      Judgment for exemplary damages;

iii.     Cost of suit;

iv.      Trial by jury as to all issues so triable; and

v.       Such other relief as this Honorable Court may deem just and appropriate.

**COUNT XII**
**MALICIOUS PROSECUTION CLAIM UNDER FLORIDA LAW AGAINST**
**DEFENDANT MORASH, INDIVIDUALLY**

For his cause of action against Defendant MORASH, individually, in Count XII, Plaintiff states:

338.    Plaintiff realleges and adopts, as if fully set forth in Count XII, the allegations of paragraphs 1 through 230.

339.    All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

340.    At all times material hereto, Defendant MORASH knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

341.    The conduct of Defendant MORASH proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

342.    The criminal proceedings instituted or continued by Defendant MORASH reached a bona fide resolution in Plaintiff's favor, in violation of Plaintiff's right to be free from malicious

prosecution under Florida law.

343. As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

344. As a further direct and proximate result of the conduct of Defendant MORASH, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

       i.     Judgment for compensatory damages in excess of $ 30,000 dollars;

      ii.     Judgment for exemplary damages;

     iii.     Cost of suit;

     iv.     Trial by jury as to all issues so triable; and

     v.     Such other relief as this Honorable Court may deem just and appropriate.

### COUNT XIII
### MALICIOUS PROSECUTION CLAIM UNDER FLORIDA LAW AGAINST DEFENDANT MCINTOSH, INDIVIDUALLY

For his cause of action against Defendant MCINTOSH, individually, in Count XIII, Plaintiff states:

345. Plaintiff realleges and adopts, as if fully set forth in Count XIII, the allegations of paragraphs 1 through 230.

346. All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

347.    At all times material hereto, Defendant MCINTOSH knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

348.    The conduct of Defendant MCINTOSH proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

349.    The criminal proceedings instituted or continued by Defendant MCINTOSH reached a bona fide resolution in Plaintiff's favor, in violation of Plaintiff's right to be free from malicious prosecution under Florida law.

350.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

351.    As a further direct and proximate result of the conduct of Defendant MCINTOSH, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity.  The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

     i.     Judgment for compensatory damages in excess of $ 30,000 dollars;

     ii.     Judgment for exemplary damages;

     iii.     Cost of suit;

     iv.     Trial by jury as to all issues so triable; and

v.      Such other relief as this Honorable Court may deem just and appropriate.

**COUNT XIV**
**MALICIOUS PROSECUTION CLAIM UNDER FLORIDA LAW AGAINST**
**DEFENDANT BRENNAN, INDIVIDUALLY**

For his cause of action against Defendant BRENNAN, individually, in Count XIV, Plaintiff states:

352.    Plaintiff realleges and adopts, as if fully set forth in Count XIV, the allegations of paragraphs 1 through 230.

353.    All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

354.    At all times material hereto, Defendant BRENNAN knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

355.    The conduct of Defendant BRENNAN proximately caused criminal proceedings to be instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

356.    The criminal proceedings instituted or continued by Defendant BRENNAN reached a bona fide resolution in Plaintiff's favor, in violation of Plaintiff's right to be free from malicious prosecution under Florida law.

357.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

358.    As a further direct and proximate result of the conduct of Defendant BRENNAN,

Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

    i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

    ii.     Judgment for exemplary damages;

    iii.    Cost of suit;

    iv.    Trial by jury as to all issues so triable; and

    v.     Such other relief as this Honorable Court may deem just and appropriate.

### COUNT XV
### MALICIOUS PROSECUTION CLAIM UNDER FLORIDA LAW AGAINST DEFENDANT CULLUM, INDIVIDUALLY

For his cause of action against Defendant CULLUM, individually, in Count XV, Plaintiff states:

359. Plaintiff realleges and adopts, as if fully set forth in Count XV, the allegations of paragraphs 1 through 230.

360. All those who by direct act or indirect procurement personally participate in or proximately cause the initiation or continuation of a malicious prosecution are jointly and severally liable therefore.

361. At all times material hereto, Defendant CULLUM knew the arrest warrant affidavit failed to establish probable cause for Plaintiff's arrest for the murder of Sheila Hamner, or intentionally, or with reckless disregard for the truth, made false statements or material omissions necessary and material to the determination of probable cause.

362. The conduct of Defendant CULLUM proximately caused criminal proceedings to be

instituted and continued against Plaintiff with malice, and in the absence of probable cause that Plaintiff was guilty-in-fact of the murder of Sheila Hamner

363.    The criminal proceedings instituted or continued by Defendant CULLUM reached a bona fide resolution in Plaintiff's favor, in violation of Plaintiff's right to be free from malicious prosecution under Florida law.

364.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering, and damaged reputation, including business reputation/goodwill.

365.    As a further direct and proximate result of the conduct of Defendant CULLUM, Plaintiff suffered loss of liberty and freedom, mental anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, lost wages, and loss of earning capacity. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights.

WHEREFORE, Plaintiff prays:

i.      Judgment for compensatory damages in excess of $ 30,000 dollars;

ii.     Judgment for exemplary damages;

iii.    Cost of suit;

iv.     Trial by jury as to all issues so triable; and

v.      Such other relief as this Honorable Court may deem just and appropriate.

**DEMAND FOR JURY TRIAL**

366.    Plaintiff demands trial by jury on all issues so triable as of right.

**DATED** this _____22nd_____ day of December, 2020.

By:   *s/. Hugh L. Koerner*

Hugh L. Koerner
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Fort Lauderdale, FL 33021
Telephone: (954) 522-1235
Facsimile:  (954) 522-1176
*Attorneys for Plaintiff Kenneth Hamner*